# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON



DATE NOV 2 1 2013

for CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Nov. 21, 2013

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 87448-4 |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| ROY STEVEN JORGENSON, | ) | |
| | ) | Filed NOV 2 1 2013 |
| Appellant. | ) | |
| | ) | |

GONZÁLEZ, J.—Washington law prohibits firearms possession by someone released on bond after a judge has found probable cause to believe that person has committed a serious offense. RCW 9.41.040(2)(a)(iv). Roy Jorgenson was released on bond after a trial court judge found probable cause to believe he had shot someone. He was arrested with a handgun and an AR-15 rifle. Jorgenson was not at home at the time, nor is there any evidence that he was defending himself. He was convicted of violating RCW 9.41.040(2)(a)(iv).

Jorgenson claims that RCW 9.41.040(2)(a)(iv) violates his rights to bear arms under the federal and state constitutions. We defer to the legislature's conclusion that

when a trial judge finds probable cause to believe a defendant committed a serious offense, public safety justifies temporarily limiting that person's right to possess arms. We hold that the statute is constitutional as applied to Jorgenson and affirm his conviction.

## I. FACTS AND PROCEDURAL HISTORY

The State charged Jorgenson with assault in the first degree for shooting another man. On June 6, 2008, a Cowlitz County Superior Court judge found probable cause to believe Jorgenson had committed the crime. *See* CrR 2.2(a), 3.2.1. Jorgenson posted bond and was released from jail with no specified release conditions.

At a pretrial hearing on August 5, 2008, the prosecutor requested a specific release condition barring possession of firearms, but the judge declined to impose the condition. At another pretrial hearing on October 14, 2008, while Jorgenson was present, the prosecutor advised the court that RCW 9.41.040(2)(a)(iv) forbade Jorgenson from possessing a firearm while his case was pending. The court declined to directly advise Jorgenson of the prohibition, relying on defense counsel's assurance that he would "take care of it." Clerk's Papers at 30.

On November 25, 2008, police officers responded to a 911 call reporting a gunshot and found Jorgenson standing outside his car. Jorgenson admitted he had a rifle and a handgun in the car, and the officers could see the rifle in plain view. The officers knew of Jorgenson's pending trial for first degree assault and arrested him for

second degree unlawful possession of a firearm. On a later search pursuant to a warrant, officers found a 9mm Tokarev handgun and an Olympic Arms AR-15 rifle inside Jorgenson's car.

Jorgenson was charged with two counts of second degree unlawful possession of a firearm under RCW 9.41.040(2)(a)(iv).[1] The trial court denied Jorgenson's motion to dismiss on grounds of due process, equal protection, and the state and federal constitutional rights to possess firearms. Jorgenson was convicted on both counts by stipulation of facts.

Jorgenson appealed his convictions, arguing that RCW 9.41.040 violates the United States Constitution and the Washington Constitution. The Court of Appeals, Worswick, C.J., certified the case to this court pursuant to RCW 2.06.030.

## II. STANDARD OF REVIEW

Constitutional issues are reviewed de novo. *State v. Sieyes*, 168 Wn.2d 276, 281, 225 P.3d 995 (2010) (citing *State v. Chavez*, 163 Wn.2d 262, 267, 180 P.3d 1250 (2008)). This court will presume a legislative enactment constitutional and, if possible, construe an enactment so as to render it constitutional. *City of Seattle v. Montana*, 129 Wn.2d 583, 589-90, 919 P.2d 1218 (1996).

---

[1] "A person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the second degree, if the person does not qualify under subsection (1) of this section for the crime of unlawful possession of a firearm in the first degree and the person owns, has in his or her possession, or has in his or her control any firearm: . . . If the person is free on bond or personal recognizance pending trial, appeal, or sentencing for a serious offense as defined in RCW 9.41.010."

It is unclear to us from the briefing whether Jorgenson contends RCW 9.41.040(2)(a)(iv) is facially unconstitutional or only as applied to him, but we treat this as an as-applied challenge.[2] *See Wash. State Republican Party v. Pub. Disclosure Comm'n*, 141 Wn.2d 245, 282 n.14, 4 P.3d 808 (2000) ("a facial challenge must be rejected if there are any circumstances where the statute can constitutionally be applied" (citing *In re Det. of Turay*, 139 Wn.2d 379, 417 n. 28, 986 P.2d 790 (1999))). A statute that is found unconstitutional as applied remains good law except in similar circumstances. *City of Redmond v. Moore*, 151 Wn.2d 664, 669, 91 P.3d 875 (2004).

## III. ANALYSIS

Jorgenson argues that RCW 9.41.040(2)(a)(iv) unconstitutionally infringes on his right to bear arms under article I, section 24 of the Washington Constitution and under the Second Amendment to the United States Constitution.[3] RCW

---

[2] Jorgenson apparently framed his argument as an as-applied challenge during oral argument. Wash. Supreme Court oral argument, *State v. Jorgenson*, No. 87448-4 (October 4, 2012), at approx. 14 min., 45 sec., *audio recording by* TVW, Washington State's Public Affairs Network, *available* at http://www.tvw.org.

[3] The dissent concludes RCW 9.41.040(2)(a)(iv) is facially invalid, apparently under the due process clause of the Fourteenth Amendment. *See* dissent at 1-2. While this is an interesting issue, it is not properly before this court because the parties did not brief it. However, we respectfully disagree with our colleague's characterization of the relevant case law. Federal courts have not consistently found the Adam Walsh Amendments' pretrial prohibition on firearm possession unconstitutional, as the dissent suggests. *See* dissent at 3-4. In some cases the dissent relies upon, the courts considered only the Adam Walsh Amendments' curfew, home detention, or home monitoring requirements. *United States v. Karper*, 847 F. Supp. 2d 350, 356-57 (N.D.N.Y. 2011); *United States v. Smedley*, 611 F. Supp. 2d 971, 974 (E.D. Mo. 2009) (expressly declining to consider the defendant's challenge to the firearm restriction); *United States v. Merritt*, 612 F. Supp. 2d 1074, 1075-76 (D. Neb. 2009); *see also United States v. Torres*, 566 F. Supp. 2d 591, 596-98 (W.D. Tex. 2008) (declaring all the pretrial release

9.41.040(2)(a)(iv) proscribes the ownership, possession, or control of any firearm by a person who is "free on bond or personal recognizance pending trial, appeal, or sentencing for a serious offense as defined in RCW 9.41.010." "Serious offenses" are felonies including any crime of violence, indecent liberties, and sexual exploitation. RCW 9.41.010(18).

1.     Washington Constitution

Where feasible, we resolve constitutional questions first under our own state constitution before turning to federal law. *O'Day v. King County*, 109 Wn.2d 796, 801-02, 749 P.2d 142 (1988) (citing *State v. Coe*, 101 Wn.2d 364, 373-74, 679 P.2d 353 (1984)). "Besides our responsibility to interpret Washington's Constitution, we must furnish a rational basis 'for counsel to predict the future course of state decisional law.'" *Id.* at 802 (quoting *State v. Gunwall*, 106 Wn.2d 54, 60, 720 P.2d 808 (1986)).

Article I, section 24 of the Washington Constitution provides, "The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or

---

restrictions facially invalid, but primarily discussing the curfew). In contrast, several courts have upheld categorical limits on firearm possession. *Infra* pp. at 19-20. Moreover, the case raised by the dissent that considered the firearm prohibition in greatest detail also remarked on the tenuous connection between the charged crime (receiving and possessing child pornography) and the firearm restriction—a disconnect we do not have in the case at bar. *United States v. Arzberger*, 592 F. Supp. 2d 590, 603 (S.D.N.Y. 2008) ("Indeed, the Government may well find it difficult to articulate a nexus between an accusation of receiving child pornography and the need to prohibit possession of a firearm."). There is much less distance between first degree assault with a firearm and a firearm restriction.

corporations to organize, maintain or employ an armed body of men." Jorgenson argues that article I, section 24 provides broader protection than the Second Amendment. We declined to address this issue in *Sieyes*, but it is properly before us now. In comparing the scope of the state and federal constitutions, we look to six factors: the text of the state constitution, differences in the text of parallel state and federal constitutional provisions, the history of the state constitution, preexisting state law, structural differences between the state and federal constitutions, and matters of particular state interest or local concern. *Gunwall*, 106 Wn.2d at 61-62. As we discuss below, these factors show that the state and federal rights to bear arms have different contours and mandate separate interpretation.

*Textual language and differences between parallel provisions*

We examine the first two *Gunwall* factors together because they are closely related. These factors indicate that the firearm rights guaranteed by the Washington Constitution are distinct from those guaranteed by the United States Constitution.

Like the United States Constitution, the Washington Constitution vests firearm rights in the "individual citizen." WASH. CONST. art. I, § 24; *District of Columbia v. Heller*, 554 U.S. 570, 577, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). But unlike the federal "right . . . to keep and bear arms," U.S. CONST. amend. II, the state right protects an individual's right to "bear arms in defense of himself, or the state," WASH. CONST. art. I, § 24. The phrase "in defense of himself, or the state" is no mere prefatory clause, as the Supreme Court found the language "[a] well regulated Militia,

being necessary to the security of a free State" to be in *Heller*. 554 U.S. at 577. Rather, the phrase is a necessary and inseparable part of the right in itself. *See Montana*, 129 Wn.2d at 594 ("The constitutional text indicates the right is secured not because arms are valued per se, but only to ensure self-defense or defense of state."). Reading the Washington Constitution to give these additional words meaning, we conclude that the plain language of article I, section 24 is distinct and should be interpreted separately from the Second Amendment to the federal constitution.

*Constitutional and common law history*

Another factor supporting a different reading of the Washington Constitution is our common law history. Our constitution is patterned primarily on other state constitutions, which themselves draw from prerevolutionary common law. *See State v. Earls*, 116 Wn.2d 364, 391, 805 P.2d 211 (1991) (Utter, J., dissenting) ("Washington's Declaration of Rights in article 1 of the constitution had its sources primarily in other states' constitutions, rather than the federal charter." (citing Robert J. Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. PUGET SOUND L. REV. 491, 497 (1984); THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, at 512 n.40 (Beverly Paulik Rosenow ed., 1962) (article I, section 24 borrows from the Second Amendment of the United States Constitution, article I, section 27 of the Oregon Constitution, and W. Lair Hill's proposed article I, section 28))).

7

In turn, many early state constitutions couch firearm rights in terms of self-defense or defense of the state. *See Heller*, 554 U.S. at 585 & n.8 (citing constitutional provisions from nine states guaranteeing the right to "'bear arms in defense of themselves and the state'" or "'bear arms in defense of himself and the state'"). The plain text of these rights is different from the plain text of the federal right to bear arms. Therefore, like the first and second *Gunwall* factors, the third *Gunwall* factor points toward a separate interpretation.

*Preexisting state law*

Preexisting state law does not demonstrate how the state right compares to its federal counterpart. *Gunwall*, 106 Wn.2d at 62. The right to bear arms under the state constitution is not absolute but is instead subject to "'reasonable regulation.'" *Montana*, 129 Wn.2d at 593 (quoting *Morris v. Blaker*, 118 Wn.2d 133, 144, 821 P.2d 482 (1992)); *see, e.g., id.* at 592-96 (upholding Seattle's ban on carrying fixed-blade knives); *Second Amendment Found. v. City of Renton*, 35 Wn. App. 583, 586-87, 668 P.2d 596 (1983) (upholding municipal ban on carrying firearms while on any premises where alcoholic beverages are dispensed by the drink); *State v. Tully*, 198 Wash. 605, 606-07, 89 P.2d 517 (1939) (upholding concealed weapons license requirement and law prohibiting those convicted of a violent crime from possessing a pistol). As we explain below, Second Amendment case law is currently evolving. It is uncertain how the federal right compares to our preexisting "reasonable regulation" analysis. We move on to the fifth *Gunwall* factor.

*Structural differences*

In *Gunwall*, we found the structural differences between the state and federal constitutions required us to read article I, section 7 of the Washington Constitution more broadly than its federal equivalent. We observed that where the United States Constitution is a *grant* of enumerated powers, the Washington Constitution is a *limitation* on the otherwise plenary power of the state. *Gunwall*, 106 Wn.2d at 66-67. The same reasoning applies here. Because the state has the plenary power to act unless expressly forbidden by the state constitution or federal law, we give a broad reading to the "explicit affirmation of fundamental rights in our state constitution." *Id.* at 62.

*Particular state interest and concern*

The final *Gunwall* factor directs us to consider whether the subject matter is local in character or a matter of national policy. *Id.* Firearm ownership varies radically between localities, as does the incidence of firearm violence. *McDonald v. City of Chicago*, ---- U.S. ----, 130 S. Ct. 3020, 3128-29, 177 L. Ed. 2d 894 (2010) (Breyer, J., dissenting). Furthermore, federalism and comity place the state courts in the role of the "primary protectors of the rights of criminal defendants." *Cabana v. Bullock*, 474 U.S. 376, 391, 106 S. Ct. 689, 88 L. Ed. 2d 704 (1986). Therefore, this factor also instructs us to look to the state right separately from the federal right.

The *Gunwall* analysis, aside from the inconclusive fourth factor, suggests we should interpret the state right separately and independently of its federal counterpart. We analyze article I, section 24 below.

We have long held that the firearm rights guaranteed by the Washington Constitution are subject to reasonable regulation pursuant to the State's police power. *State v. Krantz*, 24 Wn.2d 350, 353, 164 P.2d 453 (1945); *see also Montana*, 129 Wn.2d at 593; *Morris*, 118 Wn.2d at 144; *State v. Rupe*, 101 Wn.2d 664, 707 n.9, 683 P.2d 571 (1984). *Heller* and *McDonald* left this police power largely intact. *Heller* explicitly recognized "presumptively lawful" firearm regulations, such as those banning felons and the mentally ill from possessing guns. 554 U.S. at 626-27 & n.26. And while *Heller* rejected the use of a "freestanding 'interest-balancing' approach" to determine the scope of Second Amendment rights, *id.* at 634, we read the Washington Constitution's provisions independently of the Second Amendment pursuant to *Gunwall*.

Under this court's precedent, a constitutionally reasonable regulation is one that is "reasonably necessary to protect public safety or welfare, and substantially related to legitimate ends sought." *Montana*, 129 Wn.2d at 594 (citing *State v. Spencer*, 75 Wn. App. 118, 121, 876 P.2d 939 (1994); *Second Amendment Found.*, 35 Wn. App. at 586-87). We "balanc[e] the public benefit from the regulation against the degree to which it frustrates the purpose of the constitutional provision." *Id.* The Court of

10

Appeals applied this test to the statute at bar in *State v. Spiers*, 119 Wn. App. 85, 79 P.3d 30 (2003).

The *Spiers* court held that RCW 9.41.040 was unconstitutional to the extent it proscribed mere ownership of firearms by a person charged with a serious crime. 119 Wn. App. at 94. The statute, the Court of Appeals held, effectively forced a defendant to dispose of all his or her weapons before leaving custody in order to avoid prosecution. *Id.* at 93. Therefore, the statute burdened firearm rights to the point of frustrating the appellant's article I, section 24 rights almost entirely. *Id.* at 93-94. Specifically, the Court of Appeals held that criminalizing firearm *ownership* did not advance public safety over and above the effects of criminalizing possession and control. *Id.* at 94 ("The prohibition against possession and control of a firearm is sufficient to protect public safety and welfare. The public does not derive much, if any, additional benefit by forbidding a person who is free on bond pending trial for a serious offense from owning firearms beyond that benefit secured by forbidding such persons from possessing or controlling firearms."). The Court of Appeals held that the ownership ban of RCW 9.41.040(2)(a)(iv) was not reasonably necessary to protect public safety, and reversed those convictions not based on evidence of actual possession and control. *Id.* at 95.

Following *Montana*, we look first to public benefit, then to whether the regulation frustrates the purpose of article I, section 24. The State has an interest in preventing crime by persons awaiting trial. Although we do not find relevant

11

legislative history specifically regarding the ban on defendants charged with serious offenses, we can safely presume that this provision pertains to the legislature's goal of "'reducing the unlawful use of and access to firearms'" as a means of addressing "'increasing violence in our society.'" Matthew R. Kite, State v. Radan: *Upsetting the Balance of Public Safety and the Right To Bear Arms*, 37 GONZ. L. REV. 201, 206 (2002) (quoting violence reduction programs act, LAWS OF 1994, 1st Sp. Sess., ch. 7, § 101).[4] Thus, we turn to the question of whether proscribing possession or control of a firearm by a defendant unduly frustrates the purposes of article I, section 24.

We conclude that RCW 9.41.040(2)(a)(iv) is substantially related to its purpose of protecting the public from firearm violence. Although, as the Court of Appeals noted in *Spiers*, it is questionable whether public safety is furthered by prohibiting mere *ownership* of firearms rather than only their possession by defendants released on personal recognizance or bail, that issue is not before us because Jorgenson does not dispute the trial court's conclusion that he possessed the guns. Moreover, the legislature limited this prohibition to a defendant charged with a specific serious offense, and only *after* a neutral judge has found probable cause to believe the defendant committed a serious offense. *See* CrR 2.2(a), 3.2.1. The aptness of this firearm restriction is particularly apparent in this case, where Jorgenson violated the firearm prohibition while on bail after a judge found probable cause to believe

---

[4] But we note that the legislature was not contemplating firearm crimes specifically by persons released on bond or personal recognizance. RCW 9.41.040(2)(a)(iv) was not added to the Code until 1996. LAWS OF 1996, ch. 295, § 2.

Jorgenson had shot someone. Jorgenson also possessed the firearms while driving, rather than in the home, "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. In deference to the legislature's finding that certain crimes justify limited restriction of firearms, and because the trial court found probable cause to believe Jorgenson had shot someone, we hold that RCW 9.41.040(2)(a)(iv) is reasonably necessary and does not violate article I, section 24 as applied to Jorgenson.[5]

2.     Second Amendment

We next consider whether RCW 9.41.040(2)(a)(iv) violates the Second Amendment to the United States Constitution. The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This protection binds Washington State. *McDonald*, 130 S. Ct. at 3026; *Sieyes*, 168 Wn.2d at 291.

The Second Amendment vests the right to bear arms in the individual. *Heller*, 554 U.S. at 602. In *Heller*, the Court struck down under the Second Amendment a District of Columbia law that totally banned handgun possession in the home and required any lawful firearm in the home to be disassembled or secured with a trigger

---

[5] Although not before us here, we note that Washington courts have recognized the defense of necessity for unlawful possession of a firearm. *State v. Jeffrey*, 77 Wn. App. 222, 225-26, 889 P.2d 956 (1995) (a defendant must show "(1) he was under unlawful and present threat of death or serious injury, (2) he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct, (3) he had no reasonable alternative, and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm"); *State v. Stockton*, 91 Wn. App. 35, 43-44, 955 P.2d 805 (1998). Thus, when self-defense is most urgent, courts have recognized that use of a firearm may be defensible.

lock. *Id.* at 628, 635. But the rights guaranteed by the Second Amendment are neither absolute nor unconditional. The Court identified "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" as examples of "presumptively lawful regulatory measures" controlling ownership of firearms. *Id.* at 626-27 & n.26.

The level of scrutiny (if any) applicable to firearm restrictions challenged under the Second Amendment is not settled. In light of *Heller*, we declined to analyze a different subsection of RCW 9.41.040 under any level of scrutiny, instead looking to the original meaning and traditional understanding of the right protected by the Second Amendment, together with the burden imposed by upholding a statutory provision forbidding children from possessing firearms. *Sieyes*, 168 Wn.2d at 295 (citing Eugene Volokh, *Implementing the Right To Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1449 (2009)). But the *Heller* Court did not rule out the possibility that traditional levels of scrutiny may be appropriate to evaluate some Second Amendment challenges. Rather, the Court found that rational basis did not sufficiently protect the right to bear arms and that the District of Columbia's broad handgun prohibition would fail constitutional muster "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." 554 U.S. at 628 & n.27. Furthermore, it

is at least questionable whether some of the presumptively constitutional regulations identified by the Court would withstand scrutiny under the historical understanding of the right to bear arms. *Compare* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695, 708 (2009) ("Though recognizing the hazard of trying to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I."), *with* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1984) ("Felons simply did not fall within the benefits of the common law right to possess arms."); *and* Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1376 (2009) ("One searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership. Such laws seem to have originated in the twentieth century."), *with United States v. Emerson*, 270 F.3d 203, 226 n. 21 (5th Cir. 2001) (noting that "'lunatics'" and "'those of unsound mind'" were historically prohibited from firearm possession (quoting Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?* 36 OKLA L. REV. 65, 96 (1983) and Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151 (1986))). The historical test we embraced in *Sieyes* may not be appropriate for evaluating every type of firearm regulation, and a level of scrutiny analysis may be proper.

Federal courts after *Heller* have considered different levels of scrutiny depending, at least in part, on the type of law challenged and the type of limit imposed on the right to bear arms. *United States v. Call*, 874 F. Supp. 2d 969, 976 (D. Nev. 2012) (quoting *United States v. Reese*, 627 F.3d 792, 801 (10th Cir. 2010)). Courts have compared Second Amendment challenges to those brought under the First Amendment, noting that intermediate scrutiny is applied when reviewing time, place, and manner restrictions on speech. *United States v. Laurent*, 861 F. Supp. 2d 71, 103 (E.D.N.Y. 2011) (collecting cases). By analogy, many courts have adopted intermediate scrutiny when evaluating restrictions on gun possession by particular people or in particular places. *Id.* In *Laurent*, for example, the court considered a Second Amendment challenge to a ban on receipt of firearms by a person who is under indictment for a crime punishable by imprisonment for more than one year. *Id.* at 104; 18 U.S.C. § 922(n).[6] The court found that the firearm ban applied to only a narrow class of persons, unlike the prohibition in *Heller* that extended to the public at large; that the provision did not prohibit possessing firearms, but merely shipping or receiving them; and that the ban applied for only the time between indictment and either acquittal or conviction. *Laurent*, 861 F. Supp. 2d at 104. The *Laurent* court therefore concluded that intermediate scrutiny was the appropriate standard. *Id.*; *see also Reese*, 627 F.3d at 801, 802 (considering under intermediate scrutiny a law

---

[6] 18 U.S.C. § 922(n) provides that it is unlawful for "any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

16

prohibiting possession of a firearm by a person subject to a domestic protection order); *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011) (reviewing under intermediate scrutiny a former federal regulation that prohibited carrying or possessing a loaded weapon in a motor vehicle within national park areas). *But see United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009) (applying strict scrutiny to a statute banning persons convicted of misdemeanor domestic violence from possessing firearms); *Nordyke v. King*, 681 F.3d 1041, 1044-45 (9th Cir. 2012) (declining to determine what type of heighted scrutiny applies to laws that substantially burden Second Amendment rights); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (rejecting rational basis as the appropriate standard but otherwise avoiding "the 'levels of scrutiny' quagmire").

We find intermediate scrutiny is appropriate to evaluate RCW 9.41.040(2)(a)(iv). Although there is no exact federal counterpart to this restriction, we are guided by the court's analysis of the comparable statute in *Laurent*.[7] Unlike the handgun prohibition in *Heller*, for example, which applied to everyone in the jurisdiction, Washington's law bans only persons who have been charged with any of an enumerated list of "serious offenses." Moreover, unlike the ban on convicted felons possessing firearms, RCW 9.41.040(2)(a)(iv) is limited in duration, affecting a

---

[7] We also note that at least two other states ban persons who have been charged with certain crimes and released on bail or personal recognizance from possessing weapons. HAW. REV. STAT. § 134-7(b); BALDWIN'S OHIO REV. CODE ANN. § 2923.13(A)(2)-(3) (West). Neither state has reviewed the validity of such restrictions under the Second Amendment after *Heller*.

person only while on bond or personal recognizance. Although Washington's firearm ban is broader than 18 U.S.C. § 922(n) because it prohibits possession of firearms, rather than only shipping, receiving, or transporting them, the ban is also narrower in that it applies to persons charged with only a subset of serious crimes. We find that RCW 9.41.040(2)(a)(iv)'s imposition on a person's Second Amendment rights is sufficiently limited in the scope of affected persons and its duration to warrant review under intermediate scrutiny.

A law survives intermediate scrutiny if it is substantially related to an important government purpose. *Sieyes*, 168 Wn.2d at 295 n.18 (citing *United States v. Virginia*, 518 U.S. 515, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996)). The State has an important interest in restricting potentially dangerous persons from using firearms. *See Skoien*, 614 F.3d at 642 ("[N]o one doubts that the goal of . . . preventing armed mayhem[] is an important governmental objective."). RCW 9.41.040(2)(a)(iv) substantially relates to this interest because it forbids only persons charged with specific serious offenses from possessing firearms, and only while released on bond or personal recognizance. We need not determine whether all the listed serious offenses are sufficiently related to the State's interest in protecting the public because, as applied to Jorgenson, this relation is certainly met. While released on bond after a judge had found probable cause to believe Jorgenson had shot someone, Jorgenson was found with two guns in his car by police officers investigating the discharge of a firearm. The legislature's attempt to keep guns from potentially dangerous persons while released on bail is

18

justified as applied here. *See Laurent*, 861 F. Supp. 2d at 105 ("The fact that Laurent was charged with the instant crime because he apparently committed a crime of violence while under indictment undermines any claim he might have that § 922(n) is not substantially related to preventing him from engaging in further violence.").

We are mindful, however, of the significant burden this statute places on persons charged with a serious offense. Unlike the federal statutes prohibiting possession of firearms with obliterated serial numbers and banning loaded weapons in national park areas, RCW 9.41.040(2)(a)(iv) substantially impedes a person from exercising the right to self-defense. And, this statute differs from the ban on firearm possession by felons because it limits the Second Amendment rights of persons before they have been found guilty of a crime. But, as the Seventh Circuit has found, "some categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court." *Skoien*, 614 F.3d at 641. Indeed, courts have upheld categorical bans on firearm possession that do not require an individualized determination of dangerousness. *See, e.g., United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012) (affirming ban on firearm possession by noncitizens who are unlawfully in the country); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) (upholding federal statute prohibiting illegal drug users from firearm possession); *United States v. Yancey*, 621 F.3d 681, 687 (7th Cir.

2010) (per curiam) (same);[8] *see also* 18 U.S.C. § 922(g)(6) (firearm ban affecting any person who has been dishonorably discharged from the armed forces); 18 U.S.C. § 922(g)(7) (prohibition on firearm possession by any person who has renounced United States citizenship). We simply hold that, as applied here, the temporary restriction on Jorgenson's right to bear arms after a trial court judge found probable cause to believe he had shot someone does not violate the Second Amendment.

## IV. CONCLUSION

We find that the limited, temporary ban on possession of firearms while released on bail pending proceedings for a serious offense did not violate Jorgenson's right to bear arms under either the state or federal constitution. We affirm.

---

[8] We respectfully disagree with the dissent's characterization of *Yancey* as upholding a restriction on firearm possession after conviction of a crime. *See* dissent at 12. Yancey was charged with violating 18 U.S.C. § 922(g)(3), which makes it a felony for a person "'who is an unlawful user of or addicted to any controlled substance' to possess a gun." *Yancey*, 621 F.3d at 682 (quoting 18 U.S.C. § 922(g)(3)). Although the court noted that Yancey had been arrested for marijuana possession in the past, that fact was used merely to corroborate Yancey's admission that he regularly used marijuana. *Id.* The federal statute categorically prohibits unlawful drug users from possessing firearms—regardless of whether they have ever been convicted of, or even arrested for, any offense.

Gonzáles, J.

WE CONCUR:

Madsen, C.J.

Stephen, J.

Owens, J.

Fairhurst, J.

No. 87448-4

WIGGINS, J. (dissenting)—Washington state law categorically prohibits persons accused—but not yet convicted—of serious crimes from possessing firearms. RCW 9.41.040(2)(a)(iv). The law automatically restricts the fundamental rights of individuals who have not been found to have committed any crime, the law applies to individuals not accused of a violent crime, the law denies arrestees the right to be heard before they are denied fundamental rights, and the law denies judges the opportunity to use their discretion in making an individual determination of dangerousness. Each of these results is inconsistent with the essential fairness provisions of procedural due process.[1] I respectfully dissent.

Because I find that RCW 9.41.040(2)(a)(iv) violates due process of law, I do not address the majority's analysis of article I, section 24 of the Washington Constitution and the Second Amendment to the United States Constitution.

---

[1] The majority declines to engage with procedural due process because the parties did not brief the issue. Majority at 4 n.3. While Ray Jorgenson does not directly discuss procedural due process in his briefing before this court, he nevertheless relies on the fact that RCW 9.41.040(2)(a)(iv) does not require a finding of guilt or dangerousness. Opening Br. of Appellant at 16, *State v. Jorgenson*, No. 41828-2-II (Wash. Ct. App. Sep. 1, 2011). This argument cannot be addressed without a procedural due process analysis. Furthermore, a scheme that categorically deprives people of fundamental rights is such a patently clear violation of procedural due process as to put a cloud of constitutional doubt over the statute. Therefore, rather than passing over the issue of procedural due process, the majority should at the very least call for supplemental briefing on the issue. *See* RAP 12.1(b) ("If the appellate court concludes that an issue which is not set forth in the briefs should be considered to properly decide a case, the court may notify the parties and give them an opportunity to present written argument on the issue raised by the court.").

DISCUSSION

We must recognize what the statute at issue does. RCW 9.41.040(2)(a)(iv) categorically prevents any person from possessing firearms while pending trial for a series of statutorily enumerated serious crimes. The judge must only find probable cause that the accused committed the crime—there is no opportunity for an individualized hearing of dangerousness (indeed, the facts of this case demonstrate that judicial discretion will be overruled by the statute). The accused is deprived of the fundamental right to possess firearms and faces additional criminal prosecution upon exercising that right. *See State v. Sieyes*, 168 Wn.2d 276, 287, 225 P.3d 995 (2010) (recognizing that the right to bear arms is fundamental).

Though the right to bear arms is not absolute, regulation that infringes on an individual liberty must be implemented in a fair manner. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). This required fundamental fairness analysis, omitted by the majority, is the hallmark of our procedural due process review. *United States v. Salerno*, 481 U.S. 739, 746, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987).

I. The categorical prohibition on the possession of firearms for indictees violates procedural due process

The due process clause provides that no state shall deprive any person of "life, liberty, or property, without due process of law."[2] U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. This protects individuals from governmental interference

---

[2] Due process challenges under the Washington Constitution do not require separate analysis from those under the federal constitution. *Hardee v. Dep't of Soc. & Health Servs.*, 172 Wn.2d 1, 7 n.7, 256 P.3d 339 (2011).

with rights "'implicit in the concept of ordered liberty.'" *Salerno*, 481 U.S. at 746 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325-26, 58 S. Ct. 149, 82 L. Ed. 288 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969)). Regardless of the interests involved, "[t]he fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S. Ct. 779, 58 L. Ed. 1363 (1914).

The Supreme Court has applied a procedural due process analysis to deprivation of a defendant's liberty pretrial. *Salerno*, 481 U.S. 739. In *Salerno*, the Court considered the constitutionality of the provisions of the "Adam Walsh Amendments to the Bail Reform Act of 1984" (hereinafter Adam Walsh Amendments) that permitted a defendant to be detained pretrial on a showing that the defendant was likely to commit future crimes. *Id.* at 744, 750. The Court sustained the constitutionality of the Adam Walsh Amendments over a due process challenge specifically because the act explicitly required an individualized showing of dangerousness by clear and convincing evidence before restraining the defendant's liberty. 18 U.S.C. § 3142(f); *Salerno*, 481 U.S. at 750. The act was not "a scattershot attempt to incapacitate those who are merely suspected of these serious crimes," and a finding of probable cause that the defendant committed the charged crime was insufficient to restrict the defendant's liberty. *Salerno*, 481 U.S. at 750. Instead, *Salerno* required "a full-blown adversary hearing" in which the government must "convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id.*

3

Salerno's due process analysis of pretrial detention applies equally to the pretrial prohibition on the possession of firearms. Federal courts have applied the Salerno standard in assessing the federal Adam Walsh Amendments,[3] various provisions of which have been held facially unconstitutional by numerous federal district courts. See United States v. Karper, 847 F. Supp. 2d 350 (N.D.N.Y. 2011); United States v. Smedley, 611 F. Supp. 2d 971 (E.D. Mo. 2009); United States v. Arzberger, 592 F. Supp. 2d 590 (S.D.N.Y. 2008); United States v. Torres, 566 F. Supp. 2d 591 (W.D. Tex. 2008).[4] Like the Washington statute, the Adam Walsh Amendments identify a subset of serious crimes[5] and require that all persons indicted for those crimes are prohibited from exercising certain liberties, including possession of a firearm, without an individual determination of risk. 18 U.S.C. § 3142(c)(1)(B). Like the Adam Walsh Amendments, the statute at issue is incompatible with the requirements of procedural due process.[6]

---

[3] 18 U.S.C. § 3142(c)(1)(B) provides, "[I]n any case that involves a minor victim under section . . . 2252(a)(2) . . . of this title, . . . any release order shall contain, at a minimum, a condition of electronic monitoring and . . . the condition[] specified at subparagraph . . . (viii) [that the defendant 'refrain from possessing a firearm, destructive device, or other dangerous weapon]'. . . ."

[4] Of these cases, the only one that analyzes the firearm provision—Arzberger—finds it unconstitutional. 592 F. Supp. 2d at 602-03.

[5] Serious crimes under the Adam Walsh Amendments include kidnapping, sex trafficking, aggravated sexual abuse, sexual abuse, abusive sexual contact, murder, sexual exploitation of children, selling or buying of children, child pornography, coercion or entitlement, or failure to register as a sexual offender. 18 U.S.C. § 3142(c)(1)(B).

[6] While the Ninth Circuit of the Court of Appeals has declined to find the Adam Walsh Amendments unconstitutional, United States v. Peeples, 630 F.3d 1136 (9th Cir. 2010), its reasoning is distinguishable from the facts here. Relying on the principle that statutes should be read to avoid serious constitutional issues, the Ninth Circuit focused on provisions of the statute that enabled judges to utilize discretion, such as in the imposition

In assessing whether a right to due process exists, we examine whether the person has been deprived of a liberty interest, and we examine the process by which that liberty was denied. *In re Pers. Restraint of McCarthy*, 161 Wn.2d 234, 240-41, 164 P.3d 1283 (2007) (citing *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005)). We initially consider whether the individual is being deprived of an interest that arises from "'the Constitution,' from 'guarantees implicit in the word "liberty"' or 'from an expectation or interest created by state laws or policies.'" *Id.* (quoting *Wilkinson*, 545 U.S. at 221). Once we have determined that an individual has been deprived of a liberty interest, our test for the degree of due process required in a particular case follows the federal standard in balancing three factors: the private interest to be protected, the risk of erroneous deprivation of that interest by the government's procedures, and the government's interest in maintaining the procedures. *Morris v. Blaker*, 118 Wn.2d 133, 144-45, 821 P.2d 482 (1992) (citing *Mathews*, 424 U.S. at 335).

Applying this analysis, it is clear that RCW 9.41.040(2)(a)(iv) violates due process.

### A. RCW 9.41.040(2)(a)(iv) burdened Jorgenson's fundamental right to bear arms

The right to possess firearms falls within the scope of the right guaranteed by article I, section 24 and by the Second Amendment. *See District of Columbia v.*

---

of a curfew and the location and times of mandatory electronic monitoring. *Id.* at 1138-39. Ignoring the automatic restrictions on the possession of firearms, the court read the statute as allowing for judicial discretion. RCW 9.41.040(2)(a)(iv) has no such plausibly discretionary provisions.

*Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008); *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010); *Sieyes*, 168 Wn.2d at 291; *State v. Rupe*, 101 Wn.2d 664, 706-07, 683 P.2d 571 (1984). Recognizing this right, we also recognize that Jorgenson had a liberty interest in this right sufficient to trigger a due process analysis. *McCarthy*, 161 Wn.2d at 240 ("'A liberty interest may arise from the Constitution.'" (quoting *Wilkinson*, 545 U.S. at 221)). We do not recognize a hierarchy of constitutional rights; the fact that a right is enumerated renders it fundamental and elevates it above all nonfundamental interests. *Heller*, 554 U.S. at 634; *see also Washington v. Glucksberg*, 521 U.S. 702, 719-20, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997).

RCW 9.41.040(2)(a)(iv) clearly imposes a substantial burden on Jorgenson's liberty interest. The law not only renders unlawful the otherwise lawful possession of firearms, but it also allows the State to charge an individual with a substantive offense and to impose additional punishment. *Id.* This statute is among the most prohibitive in the nation, as it denies possession of firearms to a class of individuals who have not been proved guilty. Only two other states impose such a categorical restriction on the fundamental rights of a class without due process; neither has yet been scrutinized judicially. *See* HAW. REV. STAT. § 134-7(b); BALDWIN'S OHIO REV. CODE Ann. § 2923.13(A)(2)-(3) (West).

*B. The statute deprives the defendant of fundamental rights*

Jorgenson's fundamental right to bear arms is not unlimited. *Heller*, 554 U.S. at 626 (noting with approval long standing prohibitions on the possession of firearms by felons and the mentally ill). However, *Salerno* makes clear that the

regulation of pretrial arrestees' liberties requires an individualized determination of risk to ensure that individuals are not erroneously deprived of their fundamental rights. *See United States v. Laurent*, 861 F. Supp. 2d 71, 108 (E.D.N.Y. 2011) (citing *Salerno,* 481 U.S. at 751); *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006); *see also United States v. Williams*, 616 F.3d 685, 692-93 (7th Cir. 2010); *Arzberger*, 592 F. Supp. 2d at 602-03. "Absent any individualized determination, there is simply no way of knowing whether the deprivation of liberty is warranted or wholly erroneous." *Smedley*, 611 F. Supp. 2d at 975.

The mandatory restrictions of RCW 9.41.040(2)(a)(iv) create the irrebuttable presumption that the safety of the community cannot be reasonably assured absent the restrictions on arrestees of certain crimes. *Cf. United States v. Polouizzi*, 697 F. Supp. 2d 381, 390, 391 (E.D.N.Y. 2010) (holding that the Adam Walsh Amendments, in categorically preventing an individualized determination of risk, "provide[] near certainty of erroneous deprivation of defendant's liberty interest"). This presumption, akin to the presumption incorporated in the Adam Walsh Amendments, unjustifiably burdens the fundamental rights of some individuals. The majority asserts that "'some categorical disqualifications are permissible.'" Majority at 19 (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010)). But the majority overlooks that *Skoien* specifically referred to persons already convicted of violent misdemeanors, not untried defendants still entitled to a presumption of innocence. 614 F.3d 638. Courts have long recognized

7

the distinctions between those convicted of a crime and pretrial detainees.[7] *Scott*, 450 F.3d at 878 (contrasting pretrial releasees with convicted persons and noting that the latter "is no longer entitled to a presumption of innocence or presumptively entitled to his [or her] freedom" (quoting *United States v. Kills Enemy*, 3 F.3d 1201, 1203 (8th Cir. 1993))). No court has upheld the categorical deprivation of a fundamental right or the imposition of special bail conditions based solely on the fact of an arrest and the finding of probable cause. *Id.* at 874.

RCW 9.41.040(2)(a)(iv) automatically strips the fundamental right to possess firearms from persons accused of incest, child molestation, indecent liberties, promoting prostitution in the first degree, sexual exploitation, and vehicular assault or homicide, in addition to violent crimes. No nexus necessarily exists between these crimes and future violence arising from possession of firearms, and the State does not attempt to articulate any nexus.[8] The bald assumption that persons

---

[7] It should be noted that under our case law, even defendants who are convicted of a crime retain a procedural due process interest in release on parole. *See In re Pers. Restraint of Lain*, No. 87109-4, slip. op. at 11-13 (Wash. Nov. 7, 2013). A person who has not even been convicted is still presumed innocent and should receive at least the same level of due process protection where fundamental rights are concerned. In other words, if a convicted person has a due process interest in liberty, then a person who is merely accused has a still greater due process interest in liberty. And if a person has a due process interest in liberty, then he or she also has a due process interest in possessing firearms because all fundamental rights are considered on the same footing. *See Heller*, 554 U.S. at 634; *Glucksberg*, 521 U.S. at 719-20.

[8] The majority notes that the nature of the particular crime of which Jorgenson is accused—assault in the first degree with a firearm—creates a nexus between the accusation and potential future dangerousness. It should go without saying that the assault charge does not divest Jorgenson of the presumption of innocence. Nor does the assault charge establish that the *automatic* removal of Jorgenson's firearm rights is necessary to advance the State's interest in safety. As we discuss below, if Jorgenson was clearly dangerous, then the trial judge could have imposed (and presumably would have imposed) a firearm condition when he was given the opportunity.

accused of these crimes are more likely to commit crimes than other members of the public is overbroad and conflicts with the presumption of innocence. *Scott*, 450 F.3d at 874. While trial courts may presume the validity of criminal charges in determining the conditions to permit a pretrial release, courts may not presume that a defendant's liberty may be restricted based solely on the mere fact that a defendant is charged with a crime. *Salerno*, 481 U.S. at 750; *Bell v. Wolfish*, 441 U.S. 520, 538, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); *Scott*, 450 F.3d at 874 n.15.

The federal statutory scheme explicitly details what must occur to sufficiently limit the risk of the erroneous deprivation of fundamental rights. Beyond merely making an arrest and the finding of probable cause, the government must "convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Salerno*, 481 U.S. at 750; *see also* 18 U.S.C. §§ 922(g)(8), 3146. RCW 9.41.040(2)(a)(iv) requires the deprivation of individual liberty on probable cause without any showing of future dangerousness. Because not all arrestees charged with serious crimes can be shown to be dangerous, the statute guarantees the erroneous deprivation of certain fundamental rights.

C. *The State's general interest in public safety, without an individualized determination of risk, does not outweigh Jorgenson's interest in his fundamental right to bear arms*

The State's regulatory interest in community safety outweighs an individual's private liberty interest under special, limited circumstances. *Salerno*, 481 U.S. at 749. Individuals may be detained if they pose a risk of flight or if the State presents

evidence that they pose a danger to witnesses. *Id.* In determining the validity of the government interest, courts balance the nature of the interest and the burdens that an additional or substitute procedural requirement would entail. *Mathews*, 424 U.S. at 335.

As in *Salerno*, the State's interest in preventing danger to the community is a legitimate regulatory goal. 481 U.S. at 747 (citing *Schall v. Martin,* 467 U.S. 253, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984)). Indeed the State generally has a valid interest in preventing all crime. *Id.* at 749-50. However, this general interest in public safety must be balanced against an individual's strong interest in our fundamental liberties. *Id.* at 750-51. A general interest alone is not sufficient to overcome an individual's strong interest in fundamental rights. *Id.*

A judicial determination of probable cause that the defendant committed the charged crime is insufficient in itself to justify deprivation of a fundamental right. *Id.* at 750 (statute only valid with probable cause and with individualized determination of dangerousness); *Scott,* 450 F.3d 863 at 874 ("arrest alone [does] not establish defendant's dangerousness; it merely trigger[s] the ability to hold a hearing during which such a determination might be made"). In order to subordinate an individual's fundamental liberty interest to the needs of society, a judicial officer must find by clear and convincing proof that an arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community. *Salerno*, 481 U.S. at 750. Probable cause alone does not elevate the State's general interest in preventing crime to the point that would warrant denying Jorgenson his fundamental rights. *Compare* majority at 20, *with Salerno*, 481 U.S. at 750.

10

The government's interest in ensuring the safety of the community would not be substantially burdened by requiring an independent judicial determination of the danger caused by the defendant and the efficacy of the proposed condition. This requirement is consistent with both federal practices of detention and with restrictions on the right to bear arms in the federal system; due process requires that an arrestee's liberty be restricted only after a determination that there is no other less drastic means that can reasonably assure his or her presence at trial or the safety of the community. *Salerno*, 481 U.S. at 750; *see also* 18 U.S.C. § 3146; *cf.* 18 U.S.C § 922(g)(8). Here, there was no such individual determination, and the likelihood for error is significant, as noted above. Empowering judges to perform an individualized factual determination of the defendant's dangerousness would reduce the probability of error without burdening the government's interest in public safety. If a defendant is as clearly dangerous as the majority supposes Jorgenson to be, *see* majority at 4 n.3, then a judge would not hesitate to impose a firearm restriction. Relying on the expertise of a judge familiar with the record would help carry out the statute's purpose of removing firearms from dangerous defendants, while not burdening the constitutional rights of nondangerous defendants.

The majority identifies only two other states that prohibit pretrial releasees from possessing firearms. Majority at 17 n.7. Nearly every state is able to ensure the safety of the community by restricting the possession of firearms to those who have been convicted of a serious offense or felony or by requiring an individualized determination of dangerousness performed by the trial court following the initial indictment. *See, e.g.,* OR. REV. STAT. § 166.250; IDAHO CODE ANN. § 18-3316;

11

ALASKA STAT. § 11.61.200; N.Y. PENAL LAW § 265.01(4) (McKinney) (convicted felons cannot possess firearms); ARIZ. REV. STAT. ANN. § 13-3101(A)(7)(a), (b) (requiring an individualized finding of dangerousness for mental patients and prohibiting access to firearms for convicted felons). Nothing on the record shows that these states experience more crime by persons awaiting trial than do Hawaii and Ohio, the only two states besides Washington that impose categorical bans on possession.

In addition, no court has upheld a ban like ours after the decision of the Supreme Court in *Heller*, 554 U.S. 570. Not a single case cited by the majority supports a categorical ban on the possession of firearms by individuals pending trial in the absence of an individualized determination of dangerousness. Instead, the majority's cases either uphold restrictions on possession after conviction of a crime—*United States v. Yancey*, 621 F.3d 681, 687 (7th Cir. 2010) (per curiam); *United States v. Seay*, 620 F.3d 919, 920 (8th Cir. 2010); *Skoien*, 614 F.3d at 645; *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1228 (D. Utah 2009)—or uphold pretrial restrictions in which the defendant had an opportunity to be heard—*Reese*, 627 F.3d at 804; *United States v. Emerson*, 270 F.3d 203, 265 (5th Cir. 2001).[9]

---

[9] The majority also points to a case barring undocumented aliens from possessing firearms, *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012), and a statute barring persons who have renounced their United States citizenship from possessing firearms, 18 U.S.C. § 922(g)(7). This law is not relevant because Jorgenson is a United States citizen who had not, at the time of his arrest, been convicted of any crime. And even if *Huitron-Guizar* were on point, that case did not perform any due process analysis. Rather, it relied solely on the Second Amendment and the Equal Protection Clause. *Huitron-Guizar*, 678 F.3d at 1165-71.

Finally, the majority points to a statute that forbids persons dishonorably discharged from the military from possessing firearms. 18 U.S.C. § 922(g)(6). That statute is not helpful

The majority relies most heavily on *Laurent*, a case that explicitly limits its holding to the receipt, shipping, or transportation of firearms. 861 F. Supp. 2d at 107-08 (noting that the statute at issue "does not categorically prohibit an individual under indictment from retaining weapons already in his possession"). The majority's reliance on these decisions is misplaced in that the majority fails to recognize that these decisions do not approve of pretrial restriction of the possession of firearms without an opportunity to be heard and a judicial determination that the restriction is necessary.

It is entirely appropriate to prohibit some individuals accused of a serious crime from possessing firearms. However, the categorical denial of due process when stripping individuals of their fundamental rights can never be valid. *Salerno*, 481 U.S. at 744; *Arzberger*, 592 F. Supp. 2d at 603. RCW 9.41.040(2)(a)(iv) does not allow for an individualized determination of dangerousness before depriving defendants of their liberties; we must find the statute facially unconstitutional.

---

because a service member must be adjudicated guilty by a court-martial in order to be dishonorably discharged. Rather than supporting the majority's position, 18 U.S.C. § 922(g)(6) shows that an individualized finding of guilt is necessary before firearm rights can be taken away.

CONCLUSION

The legislature may reasonably regulate the right to bear arms, consistent with the precedents of this court and of the United States Supreme Court. However, any such regulation must comport with due process. RCW 9.41.040(2)(a)(iv) impermissibly denies Jorgenson his fundamental right to bear arms without due process of law.

I cannot limit this analysis to an as-applied challenge to RCW 9.41.040(2)(a)(iv) because due process requires a judicial determination of dangerousness and an opportunity to be heard in every case. The statute is accordingly facially invalid. Nor can I remand for a determination of dangerousness without running afoul of double jeopardy. Jorgenson simply could not have been convicted under RCW 9.41.040 absent the unconstitutional provisions of 9.41.040(2)(a)(iv). Therefore, I would reverse the Cowlitz County Superior Court and remand for dismissal of Jorgenson's convictions of unlawful possession of a firearm.

I respectfully dissent.

_____

Wiggins, J.

Johnson

Chambers, J.P.T.

No. 87448-4

J.M. JOHNSON, J. (concurring in the dissent)—I agree with the analysis of Justice Wiggins' dissent. I write separately, however, to emphasize my continued opposition to the majority's adoption of "intermediate scrutiny" as the standard of review for laws that limit the fundamental right to bear arms expressly protected by both the United States and Washington Constitutions. This is most dramatically obvious when considering Washington's unqualified right to bear arms in article I, section 24.[1]

Before the United States Supreme Court ruled in *McDonald v. City of Chicago*, __U.S.__, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010); *accord District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), that the Second Amendment applies to the states, this court in

---

[1] "The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men."

*State v. Sieyes*, 168 Wn.2d 276, 287, 225 P.3d 995 (2010), determined that the right to bear arms is fundamental. "State interference with a fundamental right is subject to strict scrutiny." *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 220, 143 P.3d 571 (2006). In order to pass strict scrutiny, a law infringing on a fundament right must be narrowly tailored to serve a compelling state interest. *Id.* (citing *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)).

In today's decision, the majority decides that the fundamental right to bear arms does not require strict scrutiny protection. Instead of ensuring that the law is narrowly tailored to serve a compelling interest, the majority gives "deference to the legislature's finding that certain crimes justify limited restriction of firearms . . . ." Majority at 13.[2]

The majority ultimately finds RCW 9.41.040(2)(a)(iv) constitutional under article I, section 24 because it is "substantially related to its purpose of protecting the public from firearm violence." Majority at 12. Likewise, when the majority analyzes RCW 9.41.040(2)(a)(iv) under the Second Amendment, it applies only "intermediate scrutiny" to find it constitutional. Majority at 17.

---

[2] Whether a firearm prohibition is constitutionally justified in other cases should be determined as applied therein, with the strict scrutiny review standard.

The majority does not persuade me. Recognizing strict scrutiny still allows an analysis in which (unlike most free speech cases) the right to bear arms will not inevitably overwhelm other compelling interests.

As I noted, of most courts in *Sieyes*, despite the clarity of our federal and state constitutions, the right to bear arms "has seldom been viewed as deserving the same protection as other fundamental rights found in either the Bill of Rights or our state constitution." 168 Wn.2d at 306 (J.M. Johnson, J., concurring and dissenting in part). "No good reason exists to continue this legacy of disregard and disproportionate review. In fact, doing so furthers the risk that courts—or the legislature—will do injustice to other fundamental constitutional rights . . . by failing to adequately scrutinize laws that limit those rights." *Id.* Just because the fundamental right in question is a right that is not politically favored, there is no reason to afford it a lesser level of protection; indeed, such constitutional rights need *more* protection.

It is possible that RCW 9.41.040 might withstand strict scrutiny with regard to serious offenses involving firearms, such as in this case where firearms seemingly were involved at each stage. The State has a compelling interest in preventing future crimes. *Westerman v. Cary*, 125 Wn.2d 277, 293, 892 P.2d 1067 (1994). But, the statute's application to "persons

accused of incest, child molestation, indecent liberties, promoting prostitution in the first degree, sexual exploitation, and vehicular assault or homicide" bears no automatic relation to this compelling interest. Dissent at 8. The definition of a "serious offense" in RCW 9.41.010 should be more narrowly tailored.

Washington's constitutional founders adopted protection for "[t]he right of the individual citizen to bear arms." CONST. art. I, § 24. This fundamental right must be accorded the protections the authors and settler-ratifiers of our constitution intended. Because this court continues to disregard this constitutional "right" and treat it as deserving as of lesser protection, I dissent. Where there is such "compelling interest," the legislature must state such interest and balance with the least restrictive measure to protect both that interest *and* the constitutional right to bear arms.